# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| Carahsoft Technology Corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>The United States,<br><br>*Defendant.* | No. 24-1965 C<br><br>Judge _____ |

## COMPLAINT

Carahsoft Technology Corporation ("Carahsoft") respectfully submits this Complaint against the United States as follows:

### Nature of the Case

1. This Complaint involves a claim by Avue Technology Corporation ("Avue") being sponsored by Carahsoft Technology Corporation. Carahsoft Technology Corporation is a reseller of a range of information technology solutions for public sector customers. Carahsoft holds a Federal Supply Schedule ("FSS") contract with the General Services Administration ("GSA"). Through that schedule contract, the Food and Drug Administration ("FDA") subscribed to a state-of-the-art software-as-a-service platform created by Avue Technology Corporation that creates, classifies, and utilizes human resources ("HR") files. Midway through the base year of a five-year contract, without informing Carahsoft or Avue (collectively,

1

the "Sellers"), the FDA decided to use a competitive, less robust system and not to exercise any of the Sellers' four option years.  To assist its efforts, under the guise of accelerating its broader deployment and use of Avue's system, the FDA required Avue to accelerate its generation of human resources files, essentially collapsing five years of that work into the base year.  It then surreptitiously copied thousands of files generated by Avue's system that were needed to make that less-robust system useable.  In doing so, the FDA intentionally violated numerous data-protection provisions in Avue's license, which was incorporated into Carahsoft's schedule contract and the FDA's task order.  The FDA thereby misappropriated millions of dollars' worth of Avue's intellectual property.

## Jurisdiction

2.     This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a).  The FDA breached an express and, in the alternative, an implied contract with the Sellers, who seek money damages for the FDA's breaches.

3.     Avue submitted a certified claim sponsored by Carahsoft to the contracting officers for both the FDA and the GSA on September 23, 2022.  Neither contracting officer responded within 60 days, so the claim was deemed denied under the Contract Disputes Act.  *See* 41 U.S.C. §7103(f)(5); FAR § 33.211.

4.     As outlined below, the FDA breached the data protection provisions of Avue's end-user license agreement.  This license agreement is itself a contract between Avue and the U.S. Government that was incorporated into a procurement

contract between the FDA and Carahsoft.

5. This case is related to an existing case before this Court, *Avue Technology Corporation v. United States*, No. 22-cv-767. Both cases relate to the same facts and circumstances, both plaintiffs are represented by the same counsel, and the parties seek the same (non-duplicative) relief.

## Parties

6. Carahsoft is a corporation with its principal place of business at 11493 Sunset Hills Road, Suite 100, Reston, VA 20190.

7. The Government is acting by and through GSA (the schedule contracting agency), the FDA (the ordering agency and end user), and the U.S. Department of Health and Human Services (the FDA's parent department) (collectively "the Government").

## Statement of the Case

### Avue's Software Platform

8. Avue is the leading developer of state-of-the-art software known as Avue Digital Services ("ADS") that allows federal agencies to automate job classification and other human resources tasks. The Avue software fully automates core federal human capital management processes—such as job classification, talent acquisition, and talent management—by combining extensive proprietary artificial intelligence with highly sophisticated engineered data relationships in a massive proprietary database, similar to Westlaw's key number system. The software also

3

automates the creation of compliant HR forms, including position descriptions ("PDs"), which each federal employee must have for personnel management decisions such as hiring and promoting.

9. Avue's software creates massive efficiencies for federal human resources and reduces the labor costs of classification and hiring actions by 80 to 90 percent. Avue's software also ensures agencies' compliance with all statutory, regulatory, and policy requirements dictated by the Office of Personnel Management.

10. The software also ensures compliance with the third-party Uniform Guidelines on Employee Selection Procedures, which set standards for merit-based, non-discriminatory hiring and personal management. The software represents Avue's investment of tens of millions of dollars into the research and design of the platform.

11. Avue does not sell licenses to its software directly to federal agencies. Instead, it sells annual subscriptions to agencies through resellers such as Carahsoft, which holds a 2011 Federal Supply Schedule contract with GSA. Because of the value of its investment in the product, Avue takes specific steps both to ensure that it is in privity of contract with the end users of its software and that the contract protects Avue's intellectual property. In 2012, GSA and Carahsoft amended the Schedule Contract by executing Modification PO-0083 to add various products from Avue. The Modification also included Avue's GSA-approved end-user

license agreement ("EULA"), which outlined the terms, conditions, and scope of use for Avue's software. Avue calls this EULA its "Master Subscription Agreement" ("MSA").

12. Specifically, the Modification stated that the "GSA approved EULA rider" is "hereby incorporated into this contract." Avue's EULA provided that the parties to the agreement were Avue and the ordering agency as end user. It also stated that, in "the event this agreement is incorporated into a government contract award, execution by the parties is not necessary."

13. The EULA includes the following provisions:

- Paragraph 3.6 states, "For federal government Subscribers, the Subscribed Services are commercial items under FAR 2.101 and this standard commercial license to the Subscribed Services shall be incorporated into and attached to the applicable contract."

- Section 5 (paragraphs 5.1 through 5.9) is titled, "Right to Use Avue Digital Services." This section distinguishes "Client Data" from "ADS Material" and sets limits on the subscriber's permission to use the latter.

- Paragraph 5.2 provides, subject to conditions, "Subscriber shall have a non-exclusive, non-transferable, limited right to use [ADS] for access to the Subscribed ADS Modules during the relevant Subscription Period under this Agreement, including the right to make use, for its own internal operations, of any printable output (whether in hard copy or electronic form) of data that it generates or downloads."

- Paragraph 5.6 details the permitted uses of ADS Material: "ADS Material (including archival documents) may only be copied and used for: (1) processing of current human

> resources transactions during the Subscription Period (*e.g.*, creating positions, staffing vacancies); and (2) record keeping with respect to current and past human resources transactions. . . . Use of ADS Material . . . to compile or create a competing or successor human resources database or system (whether or not a Subscribed Module) for use by Subscriber . . . is strictly prohibited."

14. In 2015, the FDA issued a solicitation for a software license for its relatively new Office of Human Resources to address a massive backlog in position descriptions. According to the Statement of Work, the FDA "has a backlog of over 21,000 position descriptions that require classification review, updates and/or modifications and expects approximately 6,500 new PDs, for a total of 27,500 PDs over five years."

15. Specifically, the FDA sought a vendor that could, among other things, provide it "with a license to a web-based, hosted classification system e [sic] and IT support to properly generate a minimum of 27,500 compliant position descriptions (data) in the automated system."

16. Carahsoft and Avue submitted a proposal under Carahsoft's schedule contract in response to the FDA's solicitation. The solicitation did not seek, and the proposal did not offer, a physical product, but instead a license to use a software product, as is customary in the industry.

17. The cover sheet of the proposal stated that it was "[p]owered by the Avue Technologies Corporation's SaaS Cloud Platform, Avue Digital Services®." As the proposal stated, the Sellers were offering a "'Software as a Service' (SaaS

6

or 'Cloud') subscription offering" under the terms of Avue's EULA.  The proposal was "expressly conditioned upon the [EULA] being included in the contract award."  The proposal stated that the EULA "has been expressly approved by GSA as appropriate for the Federal Government and is explicitly incorporated in all five Federal Supply Schedules (including Carahsoft's Schedule 70 contract) under which Avue is currently offered."  The proposal also included a copy of the EULA as an exhibit.

18. In September 2015, the FDA accepted the Sellers' proposal and placed an order for the license to Avue's software, including a base year and four option years.

### *The FDA Misappropriates Avue's Proprietary Material*

19. In September 2016, as the end of the base year approached, Avue conducted an analysis of the FDA's account activity.  Avue discovered that the FDA had been engaged in unusual downloading and copying of Avue's documents—the position descriptions and associated documents that the procurement was designed to generate—that were created by Avue's proprietary software.

20. Specifically, Avue discovered that a total of 5,706 Avue proprietary position file documents had been downloaded by 17 users at the FDA.  A single FDA user had downloaded 2,204 proprietary documents by herself.  This level of downloading was well in excess of acceptable usage and, moreover, was increasing exponentially near the end of the base year.

21. To Avue, this behavior appeared to be an attempt to circumvent the terms of its EULA.

22. On September 12, 2016, Avue suspended the FDA's access due to the apparent abuse it had discovered. Avue informed the agency of what looked to it to be improper downloading and violations of its EULA. The FDA protested, however, and Avue again allowed it to access the proprietary system on September 20, 2016.

23. Despite Avue's warnings, the FDA resumed its high-volume downloading immediately upon Avue providing it with access to ADS.

### *Discovery Shows the FDA's Plan to Supplant Avue's Platform in Violation of the EULA*

24. As Avue later discovered through discovery in a related case (described below), the FDA's unusual user activity was part of a plan to generate large numbers of position descriptions and other documents using Avue's proprietary software and then download and transfer them to a different platform that it had obtained from a different agency. The FDA kept this plan secret from the Sellers, and it took its actions in clear, knowing, and willful violation of the terms of the EULA.

25. The FDA's plan was to replace the Avue platform by purchasing an "HR library" template software from NASA. This "eClass" system would be an "empty" software application like Excel or PowerPoint, so the plain intent of the FDA was to use the Avue software to generate position descriptions and other HR

8

files and then use them to populate eClass.

26. From the beginning of the contract with the Sellers, the FDA directed Avue to complete the generation of position descriptions for all FDA employees in the base year of the contract, even though the Statement of Work called for the generation of only 7,500 PDs in the base year. In total, at the FDA's direction, Avue completed nearly the entire five years' worth of position descriptions called for in the original statement of work in the base year alone.

27. As early as April 2016 (only six months into the contract with the Sellers), the FDA began discussing an "[i]nterim plan if we decide not to exercise any option years" by using "SharePoint or other storage mechanism" to store the position descriptions. The FDA would then implement a "[l]ong term plan for PD library using NASA's code."

28. Indeed, an April 28, 2016, slide deck to FDA management recommended that the FDA transition to the new NASA position description library system. One of the key concerns for the FDA was that, under the contract with Avue, the "FDA data is owned by Avue" and that the "migration/transition [of that data] will results in data lost." In addition to being "[f]ree to FDA," the advantage of the NASA platform to the FDA was that it would own the data generated, rather than relying on "Avue Propriety [sic] Data."

29. FDA management gave a "green light" to proceed with this plan, and the FDA began adding staff to download proprietary materials from the Avue

9

platform.

30.     On September 27, 2016, two days before the base year of the Sellers' contract was scheduled to end, the FDA officially informed the Sellers for the first time that it would not exercise the option to renew for another year, despite giving Avue prior indications that the contract would continue into the option years.  The FDA's excuse for the late notice was that it had only determined a few days earlier that it could not exercise the option because it lacked the funding to do so.

31.     That same day, September 27, the deputy director of the FDA's human resources office, Shalisha Bazemore, sent her team an email to exhort them to continue the process of downloading Avue's proprietary data before they lost access to the platform.  The email called for a "Last Hard Push," where Ms. Bazemore wrote, "The system is showing we currently have 8,596 PDs uploaded in the SharePoint site.  The total number of PDs at the same time yesterday was 8,484.  The momentum has slowed significantly.  We need to put forth one last push over the next two days [before the Sellers' contract ended] in order to make this goal."

32.     The FDA continued its mass downloading of Avue's proprietary data literally to the close of business on the subscription end-date, September 29, 2016, after which Avue terminated access.

33.     Once the documents had been downloaded from the Avue platform, the FDA systematically stripped all references to Avue from them, including removing any Avue proprietary logos and renaming the files.  It then uploaded the

documents, cleansed of references to Avue, into a new platform.

34. A side-by-side analysis of the PDs created by Avue and those currently in the FDA's system, however, shows that they are either the same or that there is an "overwhelming similarity" between the descriptions.

35. The FDA continues to use Avue's proprietary information that it misappropriated in violation of the data protection provisions of Avue's EULA.

### *Procedural History*

36. Avue, through counsel, first complained by telephone in late 2016 that the FDA's extensive document downloading was far outside the usage limitation and violated Avue's contractual rights. The FDA took more than ten months to respond to Avue's complaints while claiming to investigate the matter. HHS counsel then provided a letter dated October 12, 2017, instructing Avue to file a formal claim. On March 13, 2018, Avue submitted its claim to the FDA, which it certified on May 3, 2018.

37. On June 25, 2018, the FDA notified Avue that it needed additional time to review Avue's claim and that it would endeavor to provide a contracting officer's final decision by August 17, 2018. That final decision never came. Instead, on August 17, 2018, the FDA issued another letter, denying that it had a contract with Avue, claiming instead to have a contract only with Carahsoft, and promising to "continue to research the allegations presented in Avue's 'claim' as a Request for Equitable adjustment." But the FDA never provided any further information on the

claim and Avue still never received a contracting officer's final decision.

38. On January 22, 2019, Avue timely appealed from the deemed denial of its claim to the Civilian Board of Contract Appeals (the "Board"). The Board raised a question, *sua sponte*, as to which contracting officer—scheduling or ordering—should have decided Avue's claim. Therefore, on July 18, 2019, Avue submitted a protective claim to GSA that was substantively identical to the claim Avue submitted to the FDA's contracting officer. Avue subsequently appealed the GSA contracting officer's deemed denial to the Board, which consolidated the two matters on December 13, 2019

39. After several rounds of motions to dismiss that focused on the issue of privity, the parties conducted and completed discovery, which closed after several extensions on September 17, 2021.

40. On January 14, 2022, the Board dismissed the Avue appeals for lack of jurisdiction. It held that the EULA "standing alone lacks core aspects of a CDA procurement contract" and that it was also not "related to" a procurement contract. The Board rejected Avue's argument that because the EULA was incorporated into Carahsoft's FSS agreement, it was directly related to that agreement. Avue timely appealed this decision to the U.S. Court of Appeals for the Federal Circuit.

41. On August 15, 2022, Avue filed a protective claim with this Court, stating that "should the Federal Circuit affirm the [Board], Avue will pursue this action under the Tucker Act." Case No. 22-cv-767, Dkt. 1, at 1. This Court

subsequently stayed that case pending the Federal Circuit's adjudication of the Board's jurisdiction. *See id.*, Dkt. 6.

42. On September 23, 2022, the Sellers signed a sponsorship agreement in which Carahsoft agreed to sponsor Avue's claim. Avue then submitted a certified claim sponsored by Carahsoft to the contracting officers for both the FDA and the GSA on September 23, 2022. Neither contracting officer responded within 60 days, so the claim was deemed denied under the Contract Disputes Act. *See* 41 U.S.C. §7103(f)(5); FAR § 33.211.

43. On March 6, 2024, the Federal Circuit reversed the Board's dismissal of the Avue appeals, holding that Avue had adequately *pled* jurisdiction. *See Avue Technologies Corp. v. Secretary of Health & Human Services*, 96 F.4th 1340, 1345 (Fed. Cir. 2024). The court remanded the case "with instructions that the Board provide Avue with an opportunity to prove its claim." *Id.* at 1342.

44. The Board reassumed jurisdiction over the Avue appeals on April 29, 2024, after remand from the Federal Circuit. On July 1, 2024, without entertaining any additional briefing or arguments, the Board again dismissed Avue's claims, holding that it lacked jurisdiction, as it had explained in its prior dismissal two years prior.

45. Avue now asserts this claim sponsored by Carahsoft on behalf of Avue. Such pass-through claims are recognized by the federal government under FAR § 44.203(c); *see also Erickson Air Crane Co. of Washington, Inc. v. United States*, 731

F.2d 810 (Fed. Cir. 1984).

## Count I
## Breach of Contract

46. The Sellers hereby incorporate all other paragraphs of this Complaint as if fully stated herein.

47. Avue's EULA (the MSA) is incorporated into Carahsoft's schedule contract under which the FDA placed the Order.

48. The schedule contract is an express contract between the FDA and Carahsoft.

49. The FDA breached the data protection terms of the EULA, as incorporated into Carahsoft's schedule contract, in multiple respects and continues in its misappropriation and breaches to the present and has indicated its intent to continue to do so.

50. The FDA's breaches of the EULA constitute breaches of Carahsoft's schedule contract.

51. In the alternative, the FDA and Carahsoft had an implied contract that the FDA would not misappropriate Avue's proprietary data. The FDA willfully breached its implied contract with Carahsoft not to misappropriate Avue's proprietary data. The FDA breached its duties of good faith and fair dealing under its implied contract with Carahsoft.

52. The FDA's breaches were, and continue to be, knowing, willful, and

intentional.

53. The FDA breached its duties of good faith and fair dealing under the EULA.

54. The FDA's past and continuing breaches have caused the Sellers to suffer money damages.

WHEREFORE, the Sellers request that they be awarded the relief requested in its Prayer for Relief.

## **Prayer for Relief**

The Sellers respectfully request that the Court grant the following relief:

1. A declaration that the FDA breached its express contract with Carahsoft, including the FDA's duties of good faith and fair dealing;

2. In the alternative, a declaration that the FDA breached its implied contract with Carahsoft, including the FDA's duties of good faith and fair dealing;

3. An award of $41,398,797.00 in damages or such other amount as is proven to be due;

4. An award of attorneys' fees and expenses; and

5. An award of all such other relief as the Court may deem proper.

November 27, 2024                                          Respectfully submitted,

*Of Counsel:*                                                    /s/ *Andy Liu*
Robert Nichols                                                Andy Liu
Michael Bhargava                                           NICHOLS LIU LLP
NICHOLS LIU LLP                                          655 15th St. NW, Suite 425
                                                                        Washington, DC 20005

15

(202) 846-9802
aliu@nicholsliu.com

*Counsel of Record for*
*Carahsoft Technology Corporation*